IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 1:20-cr-00473 |
| **Plaintiff,** | |
| -vs- | **JUDGE PAMELA A. BARKER** |
| **RICHARD WOODARD,** | |
| **Defendant.** | **MEMORANDUM OPINION & ORDER** |

Before the Court is Defendant Richard Woodard's ("Woodard") Motion to Suppress and for a *Franks* Hearing, filed on February 4, 2024. (Doc. No. 83.) On February 13, 2024, the United States of America ("the Government") filed a Response in Opposition. (Doc. No. 85.) Woodard did not file a reply.

For the following reasons, the Court DENIES Woodard's Motion to Suppress.

**I.  Procedural History**

On February 18, 2021, a federal grand jury returned a superseding indictment charging Woodard with: Possession with Intent to Distribute Fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count 1); Distribution of Fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count 2); Possession with Intent to Distribute Fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count 3); Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. § 922(g)(1) (Count 4); Possessing a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 5); and Distribution of Fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count 6). (Doc. No. 34.) The charges stem from the August 7, 2020, search of Woodard's residence at 2201 West 93rd Street, Apartment 154, in Cleveland, Ohio.

On February 4, 2024, Woodard moved to suppress the evidence seized from his residence. (Doc. No. 83.) Woodard also requested a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), arguing that the search warrant for his residence contains false statements. (*Id*. at PageID# 403.) On March 6, 2024, the Court denied Woodard's request for a *Franks* hearing because he failed to "provide any 'offer of proof' . . . to support his claim." (Doc. No. 86, PageID# 438.) The Court set an evidentiary hearing for Woodard's Motion to Suppress for April 3, 2024. (*Id*.)

On April 3, 2024, the Court conducted the evidentiary hearing. The Government called two witnesses: Detective John Graves[1] and Detective Carl Robinson[2], both with the Cleveland Division of Police. At the conclusion of its case, the Government offered, and the Court admitted, Government's Exhibits 1 through 9. Woodard testified in support of his Motion.

## II. Factual Background

On July 28, 2020, an individual died from a drug overdose. Law enforcement identified Woodard as a suspect in the death. Detective Graves and other officers began surveilling Woodard's apartment at 2201 West 93rd Street in Cleveland. On August 7, 2020, at approximately 9:40 a.m., officers saw Woodard leave his apartment building in a black Chevy Malibu. He drove to several locations. At one of those locations, he met a woman and conducted what investigators believed to be a hand-to-hand transaction through his driver's window. Officers stopped the woman and found that she had suspected heroin on her person. The officers interviewed the woman, and she admitted

---

[1] Detective Graves has worked for the Cleveland Division of Police for 29 years. He is assigned to the Narcotics Unit.
[2] Detective Robinson has worked for the Cleveland Division of Police for over 24 years.

2

that she purchased the suspected heroin from Woodard.[3] The officers did not arrest the woman, but they did confiscate the suspected heroin.

Other officers continued to follow Woodard. He made one more stop and then went back to his apartment building. He entered the building and, a short time later, left driving a silver Mercedes SUV. He first went to a garage near his residence. He then drove to a gas station on East 55th Street. There, he left his vehicle running and went inside the gas station store.

Meanwhile, Detective Graves had returned to his Narcotics Unit office at 2001 Payne Avenue to prepare a search warrant for Woodard's apartment. He spoke with a Cuyahoga County prosecutor who advised him that the officers at the gas station should arrest Woodard. Detective Graves relayed this to the officers on the scene. At approximately 11:45 a.m., they arrested Woodard. One of the officers went to turn off Woodard's running vehicle and saw suspected heroin, drug paraphernalia, and two cellphones in the center console. Sergeant Baeppler, who was at the gas station, advised Woodard of his rights after he was arrested.[4]

The officers brought Woodard back to the Narcotics Unit office for questioning. Detective Graves met the officers and escorted Woodard to the interview room on the fourth floor. He turned on the audio and video recording equipment before entering the interview room. He thought the equipment was working, but he later learned that it was not.

Once Detective Graves and Woodard sat down in the interview room, Detective Graves advised Woodard of his *Miranda* rights and pointed to a big sign on the wall listing the rights.[5]

---

[3] According to the search warrant affidavit, the woman told the officers that she had "just received" the suspected heroin from "RJ," who the officers had reason to believe was Woodard based on the cell phone number that she had called to set up the transaction. (Doc. No. 85-1, PageID# 429.)
[4] At the hearing, Woodard denied that anyone read him his rights at the gas station.
[5] Woodard also denied that Detective Graves read him his rights in the interview room.

3

Woodard agreed to speak with Detective Graves. He told Detective Graves that he had been selling drugs, that there were drugs and firearms in his apartment, and that his 12-year-old son was alone in the apartment.[6] At this point, Detective Graves stopped the interview. He called the Cuyahoga County prosecutor he had spoken with earlier. The prosecutor advised him to enter Woodard's apartment to secure the child but to not search the apartment. Detective Graves called Sergeant Baeppler and told him to secure Woodard's apartment and to make sure the child was safe. Detective Graves then continued working on the search warrant.

At around 12:35 p.m., Sergeant Baeppler, Detective Robinson, and other officers secured Woodard's apartment. They found narcotics in plain view in the kitchen and a rifle leaning against the television in the living room where Woodard's son was playing video games.

At 1:17 p.m., Detective Graves sent his draft search warrant to the Cuyahoga County Prosecutor's Office for review. At 2:07 p.m., a Cuyahoga County Court of Common Pleas judge signed the warrant. From 2:40 p.m. until 4:15 p.m., law enforcement searched Woodard's apartment pursuant to the warrant. Inside, they found a handgun and two rifles, 55.5 grams of a mixture of fentanyl, drug paraphernalia, and cash.

### III. Law and Analysis

#### A. *Miranda* Warnings

Woodard first argues that law enforcement did not advise him of his *Miranda* rights before questioning him, and, therefore, anything he allegedly said—namely, that he had drugs and guns in his apartment—must be suppressed. (Doc. No. 83, PageID# 403.) Woodard testified at the hearing

---

[6] Woodard further denied providing any of this information to Detective Graves.

that the officers did not read him his rights after they arrested him at the gas station. He also testified that Detective Graves began questioning him at the Narcotics Unit office without reading him his rights, and that he did not tell Detective Graves anything about drugs, guns, his son, or his son's age. Specifically, according to Woodward, after Detective Graves asked him a couple of questions, Woodard asked to make a phone call. Detective Graves told him no, at which point Woodard told Detective Graves that he wanted his lawyer.

On cross-examination, however, Woodard's testimony changed. He testified that he asked to make a phone call before Detective Graves started to question him. He also wavered in his denial that Detective Graves *Mirandized* him by stating that he "d[id] not remember being *Mirandized* before [Detective Graves] started asking questions."

The Government argues that law enforcement twice *Mirandized* Woodard: first when he was arrested at the gas station, and a second time at the police station before Detective Graves questioned him. (Doc. No. 85, PageID# 423.) Detective Graves testified at the hearing that Sergeant Baeppler advised Woodard of his rights at the gas station. He identified Government's Exhibit 3, the police report, and pointed to a box titled "*Miranda*" checked "yes" with two addresses noted. The first address is for the gas station. The second address is for the Narcotics Unit building where the officers brought Woodard after his arrest. Detective Graves testified that he turned on the audio and video recording equipment for the interrogation room at the Narcotics Unit where he questioned Woodard. He believed at the time that the equipment was working but later learned that it had malfunctioned. He testified that before asking Woodard any questions, he read Woodard his *Miranda* rights, and Woodard agreed to speak with him. Woodard then admitted to having drugs and guns in his apartment and that his 12-year-old son was there alone.

5

The Fifth Amendment requires that law enforcement advise a suspect before custodial interrogation that he "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A suspect can waive these rights so long as his waiver is "voluntary . . . [and] constitutes a knowing and intelligent relinquishment or abandonment of a known right or privilege." *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). The Government has the burden to prove a suspect's waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

There is contradictory testimony as to whether law enforcement gave Woodard *Miranda* warnings. Therefore, the Court must make a credibility determination—that is, determine whether it believes Detective Graves or Woodard—and explain why it is crediting one party over another. *See United States v. Cooke*, 915 F.2d 250, 252 (6th Cir. 1990). For the following reasons, the Court concludes that Woodard's testimony was not credible.

First, although Woodard initially denied receiving *Miranda* warnings, when pressed on cross-examination, Woodard changed his answer to "I don't remember." Moreover, Woodard first testified that Detective Graves began questioning him before he asked to make a phone call, but on cross-examination, he testified that the questioning started after Detective Graves allegedly denied him a phone call. Detective Graves, by contrast, consistently testified on both direct and cross-examination that he read Woodard his rights before questioning him. Woodard's lack of recollection leaves open the possibility that Detective Graves did in fact read him his *Miranda* rights, and Woodard does not remember it. *See United States v. Hill*, 2015 U.S. Dist. LEXIS 146931 at *14-15 (E.D. Ky. Oct. 8, 2015) (defendant's statements that he "did not recall the warnings" and "I don't think he read them

6

to me . . . leave open the possibility that [law enforcement] read the *Miranda* warnings, but [the defendant] did not remember it"). Additionally, Detective Graves's consistent testimony bolsters his credibility over Woodard's wavering recollection of events.

Second, the contemporaneous police report (Government's Exhibit 3) corroborates Detective Graves's testimony that he provided Woodard *Miranda* warnings. It notes that two different officers provided Woodard *Miranda* warnings at two different locations: first at the gas station where law enforcement arrested him, and second at the Narcotics Unit where Detective Graves questioned him. Moreover, the police report identifies the badge number of each officer that read Woodard his rights: Sergeant Baeppler at the gas station and Detective Graves at the Narcotics Unit.

Third, Woodard not only denies receiving *Miranda* warnings, but he also denies telling Detective Graves the age of his son and that he had drugs and guns in his apartment. Detective Graves averred in the search warrant affidavit that Woodard told him that he had "approximately 30 grams of heroin inside his apartment bedroom in plain view with three firearms." (Doc. No. 85-1, PageID# 429.) Detective Graves also averred that "Woodard stated that his 12 year[] old son was in the apartment alone." (*Id*.) During the evidentiary hearing, Woodard admitted that his son was born in 2008, making him 12 years old in 2020 at the time of the search. Woodard would have the Court believe that law enforcement entered his apartment with no justification but hoping to find an exigent circumstance, saw that Woodard's son was alone in the apartment, asked the boy his age, saw that there were multiple firearms and 30 grams of heroin in plain view, and that officers provided all this information to Detective Graves, who then falsely averred in the warrant affidavit that Woodard

provided him this information. This story is incredible[7], and it makes Woodard's initial denial that he received *Miranda* warnings even less credible.

Finally, Woodard is a biased witness. Part of making a credibility determination is "consider[ing] . . . what a witness has to gain or lose from h[is] testimony." *United States v. Lockhart*, 2013 U.S. Dist. LEXIS 48824 at *13 (E.D. Ky. Apr. 4, 2013) (citing Sixth Circuit Pattern Jury Instructions 1.07, which directs jurors to consider whether witnesses have "anything to gain or lose from the case" when making credibility determinations). This is Woodard's Motion, and he certainly has an incentive to deny that he received *Miranda* warnings so that the Court suppresses significant evidence against him. *See United States v. Solomon*, 2015 U.S. Dist. LEXIS 124206 at *9 (E.D. Ky. Sep. 17, 2015) (finding that the defendant's "potential bias is great—her very freedom is at stake in the case").

For the above reasons, the Court concludes that Detective Graves's testimony was credible.[8] And, therefore, it finds that Detective Graves did read Woodard his *Miranda* rights.

**B.     Exigent Circumstances**

Woodard also argues that law enforcement's initial entry into his apartment was unlawful because the police did not have a search warrant and there were no exigent circumstances. (Doc. No. 83, PageID# 400.) He contends that even if he did tell the police that he had drugs and guns in his

---

[7] This story is also incredible because what law enforcement ultimately found in Woodard's apartment was not 30 grams of heroin, but 55.5 grams of a mixture containing fentanyl. If Detective Graves was concocting a false narrative to search Woodard's apartment, why would he include in his affidavit that Woodard told him information which turned out to be inaccurate?

[8] The Court notes that Woodard's counsel extensively cross-examined Detective Graves about the veracity of his averments in the search warrant affidavit. The Government eventually objected, and the Court sustained the objection, but Woodard nonetheless had the opportunity to present evidence on the *Franks* portion of his Motion. For the same reasons the Court has concluded that Detective Graves's testimony was credible, the Court concludes that the search warrant affidavit did not contain any false statements and reaffirms its denial of that portion of Woodard's Motion seeking a *Franks* hearing. (*See* Doc. No. 86.)

8

apartment and that his son was there alone, "the mere presence of firearms in the apartment does not create exigent circumstances." (*Id*. (citing *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994).)

The Government agrees that law enforcement entered Woodard's apartment without a warrant, but it maintains that their entry was lawful under the exigent circumstances exception because "the officers had information from Woodard that provided an objectively reasonable basis to conclude that there was a minor child inside his apartment and that the minor child's safety was at risk." (Doc. No. 85, PageID# 415.) The Government cites a Southern District of New York case that in turn, like Woodard, cites *United States v. Johnson*. The New York court and the Government cite *Johnson* for the proposition that "[c]ourts have repeatedly held that warrantless searches are reasonable where a minor's safety is threatened." (*Id*. (quoting *United States v. Hernandez*, 2020 U.S. Dist. LEXIS 104882 at *46 (S.D.N.Y. June 16, 2020).)

Under the Fourth Amendment, warrantless entries into the home are presumptively unreasonable. *Baker v. City of Trenton*, 936 F.3d 523, 530 (6th Cir. 2019) (citing *Payton v. New York*, 445 U.S. 573, 585 (1980)). But there are some exceptions to this general rule. *Reed v. Campbell Cty.*, 80 F.4th 734, 743 (6th Cir. 2023). One is the exigent circumstances exception. *Id*. It allows for a warrantless entry in four situations: "(1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others." *Baker*, 936 F.3d at 530 (quoting *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir. 1996)). The parties focus on the fourth situation.

Under this situation, officers "may enter a home without a warrant . . . to protect an occupant from imminent injury." *Reed*, 80 F.4th at 743 (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403

9

(2006)). "'Officers do not need ironclad proof of a likely serious, life-threatening injury . . .,' but they must have an objectively reasonable basis for believing that 'a person within the house is in need of immediate aid.'" *Gradisher v. City of Akron*, 794 F.3d 574, 584 (6th Cir. 2015) (quoting *Michigan v. Fisher*, 558 U.S. 45, 47, 49 (2009)). Their decision to enter "must be based on more than a hunch or 'the mere possibility' that someone inside needs immediate aid." *Id*. (quoting *Nelms v. Wellington Way Apartments, LLC*, 513 F. App'x 541, 545 (6th Cir. 2013)). The Government bears the burden of proving that exigent circumstances existed. *United States v. Lewis*, 231 F.3d 238, 241 (6th Cir. 2000). And a court "must look to the totality of circumstances" to determine whether law enforcement was justified in entering without a warrant. *Reed*, 80 F.4th at 743 (quoting *Missouri v. McNeely*, 569 U.S. 141, 149 (2013)).

A threat to the safety of a minor child within a home can constitute an exigent circumstance "under at least some circumstances." *Smith v. City of Wyoming*, 821 F.3d 697, 710 (6th Cir. 2016); *see also Caniglia v. Strom*, 141 S. Ct. 1596, 1605 (2021) (Kavanaugh, J. concurring) (briefly noting that warrantless entries in "cases involving unattended young children inside a home" may be "perfectly constitutional"). For example, in *Johnson*, cited by both parties, law enforcement responded to a call that a 14-year-old girl was being held in an apartment against her will. 22 F.3d at 680. The young girl answered the door when the officers arrived. *Id*. She was alone but locked behind an armored gate. *Id*. The officers used a neighbor's tools to open the gate and free the girl. *Id*. The Court concluded that "[t]his warrantless entry was justified by the need to free a victim who had been held against her will and sexually assaulted." *Id*.

Conversely, in *Smith*, the Ohio Department of Job and Family services received a report that Smith "appeared to be intoxicated and might not be able to care for her children." 821 F.3d at 710.

Police acted on this report, went to Smith's home, and knocked on her door. *Id*. Smith's friend answered. *Id*. She told the officers that Smith was unavailable. *Id*. But the officers persisted and stepped inside the home to find Smith. *Id*. The Sixth Circuit found that exigent circumstances did not exist because all the officers knew was "that Smith was possibly intoxicated and unable to care for her children earlier in the day." *Id*. at 711. Additionally, the officers did not treat the report as an emergency, nor was there evidence that they believed that the children were at home and in danger. *Id*.

As for firearms, their "mere presence . . . [in a home] does not create exigent circumstances." *Johnson*, 22 F.3d at 680. But "additional factors coupled with such evidence" can create exigent circumstances. *Gradisher*, 794 F.3d at 584. For example, "indicia that such weapons might be used can support a finding of exigent circumstances." *United States v. Goins*, 2022 U.S. App. LEXIS 31948 at *7 (6th Cir. Nov. 18, 2022) (citing *Gradisher*, 794 F.3d at 584-85).

Here, the officers knew only three things. First, they knew that Woodard's 12-year-old son was alone in the apartment. Second, they knew that Woodard had "three firearms" in the apartment. And third, they knew that Woodard also had "30 grams of heroin" in the apartment. Certainly, it can be dangerous for a relatively young child to be alone in a home where drugs and guns are present. But the exigent circumstances exception requires more than "generic possibilities of danger"—it requires "a particularized showing of a risk of immediate harm." *Morgan v. Fairfield Cty.*, 903 F.3d 553, 562 (6th Cir. 2018). In other words, the exception is reserved for "[t]rue emergencies [that] do not lend themselves to extensive reflection" and situations where "delay can mean the difference between life and death." *King v. Montgomery Cty.*, 797 F. App'x 949, 955 (6th Cir. 2020) (citing *United States v. Rohrig*, 98 F.3d 1506, 1511 (6th Cir. 1996)); *see also United States v. Ponder*, 240

F. App'x 17, 20 (6th Cir. 2007) (quoting *United States v. Williams*, 354 F.3d 497, 503 (6th Cir. 2003) ("Exigent circumstances are situations where 'real, immediate, and serious consequences' will 'certainly occur' if a police officer postpones action to obtain a warrant.").

That was not the case here. The Government has not shown that there was an immediate risk of harm to Woodard's son. Yes, the officers reasonably believed that guns and drugs were in the apartment and that Woodard's son was there alone. But the Government has not demonstrated that those guns and drugs posed a real and immediate threat to the boy's life. For instance, were the firearms locked away or accessible? Were they loaded or unloaded? Were the drugs accessible? The officers did not know the answers to any of these questions when they entered Woodard's apartment. Accordingly, the Government has failed to meet its burden of proving that an exigent circumstance existed. Even so, as the Court explains in the next section, this conclusion does not require the suppression of the evidence found in Woodard's apartment.

### C. Probable Cause

Woodard argues that since the officers saw drugs and guns in the apartment during their warrantless entry, and they used that information to request a search warrant, the Court should exclude the evidence they obtained during execution of that search warrant as "fruit of the poisonous tree." (Doc. No. 83, PageID# 400.)

Under the fruit-of-the-poisonous-tree doctrine, courts must "suppress evidence that is directly or indirectly 'the tainted fruit of unlawful governmental conduct.'" *United States v. Waide*, 60 F.4th 327, 338 (6th Cir. 2022) (quoting *Nix v. Williams*, 467 U.S. 431, 441 (1984)). But the inevitable discovery doctrine is an exception to the fruit-of-the-poisonous-tree doctrine. It "allows for the

admission of evidence that would have been discovered even without the unconstitutional source." *Id.* (quoting *United States v. Cooper*, 24 F.4th 1086, 1091 (6th Cir. 2022)).

The Sixth Circuit "has repeatedly . . . employed [the inevitable discovery doctrine] when, after seizing evidence during an illegal search, police obtain and execute a search warrant based on probable cause developed before the illegal search." *Cooper*, 24 F.4th at 1091. The question is whether the "untainted portions of [the] warrant affidavit establish probable cause." *United States v. Stevens*, 2022 U.S. App. LEXIS 29332 at *7-8 (6th Cir. Oct. 20, 2022) (citing *United States v. Keszthelyi*, 38 F.3d 557, 573-75 (6th Cir. 2002)). To answer this question, the Court must "view[] affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995).

Here, stripped of its tainted statements, the warrant affidavit contained sufficient probable cause to search Woodard's apartment. Right before the warrantless entry, law enforcement (1) knew that Woodard lived at 2201 West 93rd Street, Apartment 154, in Cleveland; (2) observed him leave that apartment on August 7, 2020, and drive to a location where he sold suspected heroin to a woman; and (3) later observed him leave his apartment in a different vehicle and drive to a gas station where law enforcement arrested him and found suspected drugs and drug paraphernalia in his vehicle. Lastly and most importantly, after his arrest, Woodard *admitted* to Detective Graves that he had 30 grams of heroin and three guns in his apartment.

Detective Graves included all of this untainted information in the warrant affidavit. And he had already "formed the 'intent to obtain a search warrant'" before entering Woodard's apartment. *United States v. Bowden*, 240 F. App'x 56, 62 (6th Cir. 2007) (finding that drugs discovered during an unlawful search were admissible because the officers formed the intention to seek a warrant and

had facts sufficient to obtain a warrant before starting the warrantless search, and then they actually obtained a warrant). Here, the "untainted" information in the affidavit was "sufficient to motivate the [legal] search and would have been sufficient to convince a neutral magistrate of the existence of probable cause." *Keszthelyi*, 308 F.3d at 575. Accordingly, even though exigent circumstances did not exist to justify the officers' warrantless entry into Woodard's apartment, law enforcement would have discovered the drugs and guns inside regardless. Therefore, the Court denies Woodard's Motion to Suppress that evidence.

IV.     Conclusion

For the foregoing reasons, the Court DENIES Woodard's Motion to Suppress. (Doc. No. 83.)

**IT IS SO ORDERED.**

Dated: April 10, 2024                             *s/ Pamela A. Barker*
                                                              PAMELA A. BARKER
                                                              UNITED STATES DISTRICT JUDGE